**TANK LINING CORPORATION,**
**Appellant,**

v.

**MISSOURI PACIFIC RAILROAD**
**COMPANY, Appellee.**

No. 20219.

Court of Civil Appeals of Texas,
Dallas.

May 1, 1980.

Charles W. Chapman, Washington, D. C., Barry J. Brooks, Brooks & Mathews, Dallas, for appellant.

John P. Legendre, Dallas, for appellee.

Before GUITTARD, C. J., and AKIN and CARVER, JJ.

CARVER, Justice.

Tank Lining Corporation was sued by the Missouri Pacific Railroad Company for unpaid storage charges arising on 188 cars that the railroad was unable to "spot" on Tank Lining's private tracks, which were temporarily full and had to be retained by the railroad on its own track. Tank Lining had previously been billed for similar charges on 48 cars which it had paid under protest. Tank Lining denied the railroad's claim and filed a cross-claim to get back the charges paid under protest. The trial court granted the railroad's claim and denied Tank Lining's cross-claim. We hold that Tank Lining is not liable for the storage charges in issue because they arose from a carriage contract to which Tank Lining was not a party, either directly or by implication. Consequently, we reverse and render judgment for Tank Lining on the railroad's original action, as well as on Tank Lining's cross-action.

The facts relative to our decision are not in dispute and are largely supplied by the stipulations of the parties. Tank Lining has a place of business at Scottsdale, Texas, for the installation, or re-installation, of liners in tank and covered hopper railroad cars. The owners of each of the cars needing lining, or relining, consigned it on its own wheels, as freight, with the owner being the consignee, save in seven instances where Tank Lining was the original consignee and re-consigned the cars to the owner on the same bill of lading upon completion of the lining. On divers dates, between September 10, 1976, and May 9, 1977, the railroad had hauled each car as freight, to Scottsdale but found the private tracks of Tank Lining full. Although Tank Lining did not request the service, the railroad stored each car on its own tracks until space became available to place each car on Tank Lining's private track. The railroad billed Tank Lining for the storage of 48 cars, for the time each was stored, totaling $23,-917.91, which Tank Lining paid under protest, and now seeks to recover on its cross-action. The railroad also billed Tank Lining $42,193.72 on a similar basis for the remainder of the cars which Tank Lining refused to pay. This latter amount constituted the recovery sought by the railroad's original action.

The railroad's position in the trial court, and before this court, rests upon these premises: (1) The storage of the cars, until delivery could be made on Tank Lining's private tracks, was a service for which the railroad was compelled to charge and collect under applicable laws and tariffs; (2) the applicable tariff should be "Rule 5, Section 5, Item 1220 of Doyle's Tariff 4–Series"; and (3) Tank Lining occasioned the storage, either by not having sufficient space on its private track to accept the cars or by not performing its work at a pace that would keep up with the cars sent to it for lining. Tank Lining responds that (1) it had no control over cars sent to it for relining; (2) it was neither the owner, consignor, nor consignee (save on seven cars); (3) it made no request of the railroad for the service of storage; (4) all cars, being themselves the "freight," were only temporarily out of the control of the railroad while the linings were installed and the lien for charges in favor of the railroad was intact; (5) the tariff urged by the railroad did not apply to the service rendered; and (6) it owed no duty to the railroad with regard to its tracks or the pace of its work.

The primary question presented is whether Tank Lining can be held liable for any freight service rendered by the railroad in connection with these cars. Freight charges commence with the first service rendered by the railroad and accrue with each succeeding service rendered. Each service must be described in the tariff and the charge for each service must be at the rate set out in the tariff. The parties do not dispute these premises but only dispute *who* is required to pay. The duty to pay

ordinarily arises from a "contract of carriage" between the railroad and the party who desires the freight service. This contract is contained in the bill of lading. The party making the contract for freight service with the railroad is called the *consignor* and is liable for the service rendered. In addition, *others have been held liable for freight charges*. In the case of *New York Central R. Co. v. Sharp*, 124 Misc. 265, 206 N.Y.S. 755, 758 (Sup.Ct.1924), the court stated:

> Scores of other cases have been studied and might be here cited; but enough have been herein reviewed to show the lengths to which the courts have gone to effect the purpose of the statute prohibiting discrimination in freight rates. Liability for freight charges of the following persons has been established: (1) A consignor (of course); (2) a consignee, regardless of whether or not he is actual owner, and regardless of whether or not his character as agent is disclosed by the bill of lading or is communicated to the carrier, provided he accepts the shipment; (3) any other person who, for any reason, undertakes to pay the freight charges (by paying the part demanded) and thereby induces the carrier to deliver the goods and release the lien (depending upon possession) which the carrier has for freight charges; (4) an owner.

Tested by *Sharp*, charges on the 229 cars, consigned by each owner to himself, may not be assessed to Tank Lining because it was not "(1) a consignor," "(2) a consignee," (3) a person who "undertakes to pay" (the railroad does not contend that Tank Lining has become liable in the third category by paying under protest or, in any way, depriving the railroad of its lien) or "(4) an owner." Accordingly, Tank Lining is not liable for these charges as a matter of law.

We must now determine whether Tank Lining is liable on the seven remaining cars upon which storage charges accrued. The record reflects that, as to each of these seven cars, the owner, as consignor, originated the freight service on a bill of lading naming Tank Lining as consignee. Tank Lining received each car, lined or relined it, and *on the same bill of lading* re-consigned it on the same railroad to the owner. The railroad's possession of the car (as freight) was restored, along with its lien, and the freight services were continued to the final destination of the car.

■ We must consider whether, under *Sharp*, Tank Lining may be liable on the seven cars as to which it was "(2) a consignee." The basis upon which a consignee may be held liable for freight services is examined by the Interstate Commerce Commission in *Doughty-McDonald Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 155 I.C.C. 47, 49 (1929):

> It appears that to be entitled to recover, a party must have "privity with the carrier." Undoubtedly there was here privity of contract between complainants and defendants. When a carrier delivers freight to a consignee and the consignee accepts delivery and pays transportation charges *thereby extinguishing the carrier's lien*, a contract on the part of the consignee to pay undercharges, if any exist, is implied. Consequently, the carrier may recover in a suit for such undercharges against the consignee. [Emphasis added.]

*Doughty* relied on the case of *Union Pacific Railroad Co. v. American Smelting & Refining Co.*, 202 F. 720 (8th Cir. 1912). In *Doughty* the issue was undercharges for freight service and the court found that privity of contract existed between the consignee-claimant and the railroad to support recovery. In *Union Pacific* the issue was one of overcharges and the court found that privity of contract existed between the railroad-claimant and the consignee to support recovery. In both fact situations, "privity" was required but was "implied" because the consignee took delivery and *extinguished the carrier's lien*. Applying the reasoning illustrated by these authorities to our case, it appears that although Tank Lining was

the consignee which took delivery and which relined the seven cars, it did not extinguish the railroad's lien as the "freight" (relined cars) were re-consigned on the same bill of lading and with the same railroad, thus the lien of the railroad was not extinguished by Tank Lining's temporary possession of the freight. We hold, therefore, that Tank Lining is not liable to the railroad for the charges on these seven cars.

■ Our conclusion is supported by the reasoning in *Missouri, K. & T. Ry. Co. v. Capital Compress Co.*, 50 Tex.Civ.App. 572, 110 S.W. 1014 (1908, writ ref'd), wherein cars of cotton bales were shipped by their several owners to various cotton brokers as consignees in Austin, Texas. Upon arrival in Austin, the cars were spotted in Capital's compress for "concentration," or compression of the cotton into smaller, denser bales. After compression, the bales were returned to the cars to continue movement on the same bill of lading but heavy traffic prevented the ordinary movement time of the cars of compressed cotton thus generating demurrage charges on the cars thereby delayed. The railroad sought the demurrage from the compress on the theory that the compress had taken delivery, much like Tank Lining here, and had become liable for charges. The court in *Capital Compress* stated:

> We sustain the holding that appellee was not liable to appellant for the demurrage sought to be recovered. The findings of fact fail to show any contractual relation between them in reference to the shipment of the cotton, and, for that reason, appellee was not liable for the demurrage sought to be recovered. Appellee was engaged in the business of compressing cotton. The cotton in question did not belong, and was not consigned, to it, but to other persons. Appellee compressed the cotton, and acting as agent for the owners, delivered it to appellant for transportation, and collected from it the charges for compression. We think the trial court ruled correctly when it

held, on the facts referred to, that appellee was not liable for demurrage, if any had accrued.

110 S.W. at 1016. Likewise, we hold that there was no actual contractual relationship between the railroad and Tank Lining upon which freight charges, including storage, could be asserted against Tank Lining. Further, we hold that no contractual relationship could be *implied* in the absence of Tank Lining's retention of the "freight" resulting in the railroad being deprived of its lien. Since the cars were hauled to, and from, Tank Lining by the railroad on the same bill of lading, the railroad never lost its lien on the "freight" so as to justify the implication of a carriage contract between the railroad and Tank Lining. A contract, actual or implied, is required under the authorities we have cited to support the asserted storage charges claim by the railroad.

■ While the railroad also asserted that the storage of the cars was occasioned by the "fault" of Tank Lining, we have examined the record to see if the evidence would support the judgment on this theory. We do not find evidence to support the existence of any duty owed by Tank Lining to the railroad to have more extensive private track than it had, or to perform Tank Lining's lining, or relining, at any faster pace than it did. We are not cited to, nor have we found, any authorities that support the existence of such a duty in any comparable fact situation. Additionally, our record is silent as to any proof of damages for this asserted breach of duty other than the asserted tariff. Damages for a breach of duty are not necessarily measured by the asserted tariff which was urged as the measure of damages applicable to the railroad's claim on contract. We conclude that the judgment of the trial court cannot be supported upon this theory under the record made.

We reverse the judgment of the trial court in favor of the railroad for unpaid storage charges and render judgment in favor of Tank Lining as to the railroad's

original claim. We also reverse the judgment of the trial court denying relief to Tank Lining on its cross-action and render judgment that Tank Lining recover all storage charges paid to the railroad under protest, together with interest from date of each payment at the rate of 6% per annum to the 26th day of July, 1979, (the date of judgment in the trial court) and thereafter until paid, at the rate of 9% per annum.